# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

FIFTH THIRD BANCORP, et al.,

        Plaintiffs,

     v.

CERTAIN UNDERWRITERS AT LLOYD'S, et al.,

        Defendants.

Case No. 1:14-cv-869

Beckwith, J.
Bowman, M.J.

## MEMORANDUM OPINION AND ORDER[1]

The above case initially was consolidated with a related case, *RLI Insurance Company v. Fifth Third Bancorp.*, Case No. 1:14-cv-802, solely for purposes of discovery and pretrial proceedings. On January 9, 2017, both cases were reassigned to U.S. District Judge Timothy S. Black for all further proceedings. Although the cases were previously set for trial on different dates, (*see* Docs. 27, 70 in Case No. 14-802, Docs. 33, 77 in Case No. 14-869), both cases are presently set for trial on October 23, 2017.

Currently before the undersigned are two motions filed solely in Case No. 1:14-cv-869: (1) the Underwriters' motion to compel Fifth Third to produce certain materials as to which Fifth Third has claimed attorney client and/or work product privilege; and (2)

---

[1] The parties' respective motions and memoranda have been filed under seal. In ruling on prior motions filed under seal, the undersigned filed her Memorandum Opinion and Order under seal, while simultaneously filing a much shorter public Order that contained no reference to the parties' designated confidential materials. The undersigned has elected not to follow the same practice concerning this Order, as the Sixth Circuit has made clear that filing documents under seal in a public record is highly disfavored, and the undersigned does not believe that any compelling interests exist in favor of nondisclosure of this Order, or that such interests would outweigh the interests of the public in an open record. *See, e.g., Danley v. Encore Capital Group, Inc.*, ___ Fed. Appx. ___, 2017 WL 710470 (6th Cir. Feb. 22, 2017) (citing *Shane Grp., Inc. v. Blue Cross Blue Shield of Mich.*, 825 F.3d 299, 305-309 (6th Cir. 2016), emphasizing court's obligation to set forth specific findings to justify nondisclosure to the public, stating that a court's failure to explain compelling interests in support of nondisclosure, and why the seal is no broader than necessary, is grounds for vacating seal). Following a similar course, on May 2, 2017, Judge Black filed a public Order in Case No. 14-cv-802 that ruled on a motion filed under seal.

Fifth Third's motion for a protective order. Although Fifth Third has requested oral argument, the undersigned concludes that such argument is not needed and would not be beneficial to resolution of the fully briefed issues. See *Whitescarver v. Sabin Robbins Paper Co.*, Case No. C–1–03–911, 2006 WL 2128929, at *3, 2006 U.S. Dist. LEXIS 51524, at *7 (S.D.Ohio July 27, 2006) (exercising discretion under Local Rule 7.1(b)(2) to deny request for oral argument).

For the reasons that follow, the undersigned will partially grant the Underwriters' motion and deny Fifth Third's motion.

## I. Background

The two related cases concern Fifth Third's attempt to collect $100 million dollars on multiple bonds that it purchased from a number of insurers, including the Defendants in this case (hereinafter "the Underwriters"). The bonds, commonly referred to as fidelity bonds, generally insure against employee dishonesty or fraud.[2] The period of coverage is July 1, 2010 through June 30, 2011. The bonds cover loss "first discovered" during the bond period, even if the dishonesty or fraud occurred long before the discovery as is alleged in this case.

Related Case No. 1:14-cv-802 was first filed by RLI Insurance Company ("RLI"), one of the insurers participating in the subject bond policies. RLI's complaint seeks a declaratory judgment that it owes nothing on its bond. Fifth Third counterclaimed for breach of contract, seeking coverage. A month after RLI initiated its case, Fifth Third filed the above-captioned case against the Underwriters, all of whom also issued and/or participated in similar fidelity bonds.

---

[2] Fidelity bond insurance is distinguishable from Errors and Omissions or professional liability coverage, which usually covers losses caused by an employee's negligence while excluding intentional conduct resulting from dishonesty or fraud. *Compare Hantz Financial Services, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 130 F. Supp.3d 1089 (E.D. Mich. 2015).

The disputed claims arise out of actions taken by former Fifth Third employee, Mathew Ross, while he was a loan officer employed in the bank's structured finance group. Ross resigned from Fifth Third prior to the inception of bond coverage.[3] However, Fifth Third alleges that within the bond coverage period, it discovered it had incurred losses in excess of the bond policy limits due to Ross's misconduct.

Over a long period of time, with significant events taking place from 2007 through 2009, Ross allegedly caused Fifth Third to fund "fraudulent loan facilities" for the benefit of an individual who was Ross's undisclosed business partner (Edward Netherland), a company called InsCap Management LLC ("InsCap"),[4] and affiliated entities and persons. Specifically, Ross allegedly caused Fifth Third to fund a credit facility for use in InsCap's "Ultra" loan program,[5] resulting in the issuance of 78 Ultra loans that were used to fund the purchase of life insurance policies on wealthy individuals, with Fifth Third receiving fees and a security interest in each policy as collateral for each loan.

All of the insurers raise similar defenses, maintaining that Fifth Third discovered Ross's misconduct and/or its losses prior to the inception of the policy period, or alternatively, at a time that otherwise excludes coverage. They allege that when Fifth Third purchased the bonds, it was already aware of significant issues with the loan program, due in part to litigation in state court that included accusations of Ross's involvement in fraud. (Case No. 14-cv-869, Doc. 93 at 11). In addition, all insurers seek to deny coverage based upon untimely notice. Though not relevant to the current discovery dispute, the insurers also appear to dispute the amount of covered loss and/or their respective maximum exposure under the various bonds.

[3]Ross resigned from Fifth Third on April 10, 2010. (Case No. 14-cv-869, Doc. 93-2 at 44). He has asserted his Fifth Amendment right not to testify concerning LIPF II. (Case No. 14-cv-802, Doc. 93 at 5).
[4]InsCap later became known as Concord Capital Management, LLC, the entity that sued Fifth Third in related state court litigation.
[5]The Ultra facility/program is also referred to as the "LIPF II" facility/program.

Fifth Third asserts that even though Ross is alleged to have acted dishonestly as long ago as 2005, Ross effectively concealed his conduct from his employer for years. Fifth Third submitted its initial Proof of Loss Statement ("Loss Statement") on October 14, 2011. In the Loss Statement, Fifth Third alleged that "Ross and InsCap's owners and principal officers created, operated and manipulated these [Ultra] loan facilities and received undisclosed and illegal financial benefits which resulted in InsCap's owners and principal officers receiving tens of millions of dollars in fraudulent, undisclosed and illegal payments and Mathew Ross receiving at least $75,000 in improper financial benefit." (Case No 1:14-cv-869, Doc. 93-2 at 6). After Ross "established the LIPF II premium finance credit facility for Netherland's company, InsCap," Fifth Third "funded more than $100 million in premium finance loan advances between 2007 and 2009." (*Id.*, Doc. 93-2 at 7-8). As implemented and executed, Fifth Third characterizes the program as "riddled with fraud from its inception…." (*Id.* at 8) The Loss Statement reports that "Ross withheld information as to the actual extent of the fraud in early 2009, when InsCap purportedly disclosed the fraudulent activity which had occurred in connection with the LIPF II program (described as 'ineligible fundings'). Ross continued to manipulate and conceal information with respect to the program, which caused Fifth Third to continue funding and increased its losses." (Case No. 14-cv-869, Doc. 93-2 at 8).

Just before the policy inception date of the subject bonds, on June 11, 2010, Fifth Third filed suit in Illinois state court to collect on a 23.5 million dollar loan against Concord (previously InsCap), Columbus Nova, and individual guarantors that related to the issuance of loans under the Ultra program. Concord filed a counterclaim, and in

September 2010 Concord filed a new complaint in New York State Court,[6] alleging that Fifth Third had aided and abetted Concord's insiders in looting the assets of Concord, through conduct by Ross. (*Id.*, Doc. 93-2 at 10).

Fifth Third maintains that it did not learn of facts that would give rise to a fidelity bond claim until after it hired an external investigator, James Rechel, in January 2011, within the covered loss period. Fifth Third maintains that it promptly filed its Notice of Claim on February 8, 2011, immediately after discovering that a fraudulent wire transfer had been made to Ross in the amount of $75,100 on September 12, 2008. (Doc. 93-2 at 11). Although Fifth Third seeks no damages other than those recoverable up to the policy limits of each bond, Fifth Third has included allegations that the Insurers have acted in bad faith. No separate bad faith claim is stated in the complaint, and discovery on bad faith allegations has been stayed pending resolution of the underlying breach of contract claims.[7]

In the Court's most recent Calendar Order, discovery closes on May 15, 2017. The current dispositive motion deadline, for motions that pertain to the underlying breach of contract claims, is June 3, 2017.

## II.    Analysis of the Parties' Motions

Considering the amount in controversy, it is not surprising that discovery in the two federal cases has been contentious, with multiple prior disputes having been presented to this Court.[8] Most of the Underwriters' current motion to compel, as well as

---

[6] The New York case was later dismissed. The Illinois case is ongoing.

[7] Fifth Third suggests that it is likely to seek an award of attorney's fees under Ohio law if it can prove its bad faith allegations.

[8] On March 31, 2017, following a telephonic conference on a related dispute, the Court entered a Stipulated Order that, subject to Fed. R. Civ. P. 502(d), required Fifth Third to produce, documents that: (1) pre-date February 8, 2011; and (2) contain facts concerning: (i) Ross's actual or alleged activities; (ii) any factual or alleged fraud or misconduct relating to the LIPF II Program, or (iii) an actual or potential claim in which it is alleged that Fifth Third is liable to a third party Ross, the LIPF II Program, or Concord f/k/a InsCap, or the Clean-Up Loans. (Doc. 117). Rule 502(d) and the Stipulated Order preserved Fifth

5

Fifth Third's counter-motion for a protective order, relates to the issue of when Fifth Third "first discovered" Ross's fraudulent conduct, or as the Underwriters put it, "what did Fifth Third know and when did it know it?" (Doc. 116 at 10).

The Underwriters seek, as improperly withheld under the claim of privilege, additional documents in multiple broad categories: (1) any documents sent to or from Ross; (2) documents sent to or from all Discovery Agents; (3) documents concerning Fifth Third's internal investigation into the allegedly fraudulent conduct; (4) internal documents concerning Fifth Third's deliberations related to its reports to regulators about Ross's misconduct; (5) documents withheld as work product created prior to any litigation between InsCap and Fifth Third; and (6) documents that the Underwriters believe were improperly logged, and/or for which the privilege log is insufficiently specific to demonstrate any privilege.[9]  In a separate motion for a protective order, Fifth Third seeks to cordon off the scope of questions directed to three attorney witnesses, also based on attorney-client and/or work product privilege.

The burden of proof is on Fifth Third, as the party objecting to discovery, to prove that its asserted privilege applies.  *See generally* Fed. R. Civ. P. 26(b)(5); *Ross v. City of Memphis*, 423 F.3d 596, 606 (6th Cir. 2005).  The undersigned concludes that Fifth Third has failed to meet its burden of proof for a significant number of the referenced documents, and also has failed to meet its burden to limit the scope of the attorney-witness testimony.

---

Third's claims of privilege as to any information produced under the Order.  Unfortunately, a subsequent telephonic conference and the instant motions underscore that the Stipulated Order resolved little of the parties' ongoing dispute.

[9]The Underwriters identify nine separate categories of documents.  The undersigned has grouped together categories that allege similar deficiencies of Fifth Third's privilege log.

## A. Focusing on When Fifth Third Discovered Its Loss

As the insured, Fifth Third bears the burden of showing that it "first discovered" the claim within the relevant time period. *See generally FDIC v. N.H. Ins. Co.*, 953 F.2d 478, 482-83 (9th Cir. 1991). In its Notice of Claim, Fifth Third asserts that it did not discover Ross's alleged fraud until January 30, 2011.

The timing and extent of Fifth Third's knowledge is equally critical to the Underwriters' contention that payment is not owed because Fifth Third's Discovery Agents were "aware of" the fraud prior to purchasing the bonds. Several of the Underwriters' defenses also would preclude coverage even if Fifth Third first discovered the loss within the bond period, based upon the timing of Fifth Third's Notice and Proof of Loss, which time frames are defined by reference to the date of "discovery" of the loss. For example, the bonds required Fifth Third to provide notice at "the earliest practicable moment, not to exceed 90 days" after discovery of the loss, and to provide proof of loss within six months after discovery, "duly sworn to, with full particulars." (*See* Doc. 24-1 at 33). Based upon the February 8, 2011 Notice date, the Underwriters assert that Fifth Third's claim will be barred for untimely notice if it "first discovered" its loss before November 10, 2010, and/or barred for untimely proof of loss if discovery occurred prior to January 9, 2011.[10] Last, the timing of Fifth Third's discovery is relevant to the Underwriters' assertion that a termination provision in the bonds limited (or possibly eliminated) lability under the bonds for losses caused by Ross's misconduct. Pursuant to Section 12 of the Conditions and Limitations section of the

---

[10]The parties agree that Fifth Third's proof of loss should be considered to have been filed on June 9, 2011. The Underwriters assert that the proof of loss would be untimely if discovery occurred prior to January 9, 2011, based upon a provision that requires proof of loss to be filed within six months of the discovery of the loss. (Doc. 127 at 7, n.2).

Primary Policy, coverage terminates "as soon as" any person in a defined group at Fifth Third "learns of any dishonest or fraudulent act committed by such person…."

In short, the date of Fifth Third's discovery of its loss is crucial to Fifth Third's ability to prove its claim, as well as to the Underwriters' affirmative defenses. Given the centrality of the "discovery condition" in the bonds, this Court turns to the explicit language of that provision to resolve the pending motions.

The language in the Insuring Agreement of the Primary Bond (the "Fidelity Insuring Agreement") states:

> This bond applies only to loss first discovered by the Chief Risk Officer, Office of Risk Management, Office of General Counsel, Internal Audit, Loan Review or any Executive Officer of the first named Insured during the Bond Period [July 1, 2010 to July 1, 2011]. Discovery occurs at the earlier of the Chief Risk Officer, Office of Risk Management, Office of General Counsel, Internal Audit, Loan Review, or Any Executive Officer of the first named Insured being aware of:
>
> a.   Facts which a reasonable person would expect to result in a loss of a type covered by this bond;
>
>    or
>
> b.   An actual or potential claim in which it is alleged that the Assured is liable to a third party,
>
>    Regardless of when the act or acts causing or contributing to such loss occurred, even though the amount of loss does not exceed the applicable Deductible Amount, or the exact amount or details of loss may not then be known.

(Doc. 24-1, page 31 of 64, Section 3).

Although the parties have engaged in extensive discovery, the fact that Fifth Third's Discovery Agents include attorneys in its Office of General Counsel has led to many of the current conflicts concerning the scope of Fifth Third's asserted privileges.

## B. Discerning Ohio Law on Attorney-Client Privilege

Ohio law is controlling in a diversity case on the applicability of the attorney-client privilege. Fifth Third relies almost exclusively on a single Ohio case, *Jackson v. Greger*, 110 Ohio St. 3d 488, 854 N.E.2d 487 (Ohio 2006), which it insists controls the outcome of this discovery dispute. The Underwriters argue that *Jackson* is distinguishable, and rely instead almost as exclusively on a case from the Illinois Court of Appeals as persuasive authority. The undersigned finds no controlling law on point, but is persuaded that Ohio courts would conclude that most of the subject materials are outside the scope of the asserted privileges.

In *Jackson*, the plaintiff had filed a legal malpractice claim against her former criminal defense attorney. Aware that his client intended to pursue a § 1983 claim relating to her arrest and conviction, the attorney nevertheless advised her to plead guilty. Plaintiff alleged that the advice was negligent and led to the dismissal of her later-filed civil rights case. In defense of the malpractice case, the criminal defense attorney sought discovery of Jackson's attorney-client communications in her civil case. Both parties believed that the common law doctrine of "implied waiver," set forth in *Hearn v. Rhay*, 68 F.R.D. 574 (E.D. Wash. 1975), applied, although they disagreed on whether the criteria for implied waiver had been met. The lower courts also relied on *Hearn*. However, the majority opinion in *Jackson*[11] found *Hearn* inapplicable on the facts presented. Instead, the court found Ohio's codification of its attorney-client privilege in R.C. § 2317.02 to be controlling, rejecting any "judicially created waiver to the statutorily created privilege." In relevant part, the Ohio statute states that an

---

[11]The opinion was a fractured one, signed by four justices. Justice Lanzinger concurred in the judgment only, writing a separate dissent to stress disagreement with the majority's implicit rejection of *Hearn* and broadening of the statute. Justice Pfeifer also dissented in part, disagreeing that the statute abrogates the common law. Justice O'Donnell dissented without opinion.

attorney shall not testify "except that the attorney may testify by express consent of the client…and except that, if the client voluntarily testifies…the attorney may be compelled to testify on the same subject."  R.C. §2317.02(A)(1).

In the decade since its publication, courts have clarified that *Jackson* was not intended to wipe clean the pre-existing body of common law exceptions to privilege in Ohio.  *See, e.g., Squire, Sanders & Dempsey, L.L.P. v. Givaudon Flowers Corp.*, 127 Ohio St. 3d 161, 937 N.E.2d 533 (2010) (recognizing exceptions to the attorney-client privilege including the crime/fraud exception, a claim of a lack of good-faith effort to settle a case; and the joint representation or common interest exception); *State v. Montgomery*, 997 N.E.2d 579, ¶¶ 24-26 (Ohio Ct. App. 2013) (holding R.C. 2317.02 privilege is not absolute, recognizing "waiver" under common law where criminal defendant raises a Sixth Amendment claim of ineffective assistance of counsel in a post-conviction claim); *Waite, Schneider, Bayless & Chesley LPA v. Davis*, 2013 WL 4757486 (compelling attorney communications from outside counsel in fee dispute case based on importance of documents to resolution of underlying fee dispute).

In *Squire, Sanders,* Justice O'Donnell (who dissented in *Jackson*) wrote for the majority and explicitly rejected an argument that judicially-created exceptions to the attorney-client privilege were forbidden after *Jackson*.[12]  In *Waite, Schneider, Bayless & Chesley LPA*, U.S. District Judge Carr undertook an extensive analysis of Ohio law, including pre- and post-*Jackson*.  Judge Carr held that the pre-*Jackson* implied waiver cases applying the *Hearn* test remained "relevant to understanding and interpreting the scope of the self-protection exception" that *Jackson* ultimately applied.  *Id.* at 4; s*ee also*

---

[12] *Squire Sanders* was a somewhat stronger majority opinion, with five justices joining the majroity. Justice Lanzinger concurred only in the judgment, based upon her view that "common-law exceptions are really no different than common-law waivers," disagreeing with the majority's distinction between the two. No justices dissented; Justice Brown did not participate.

*generally Dinsmore & Shohl LLP v. Gray*, Case No. 1:14-cv-900, 2016 WL 7852522 at *7-8 (S.D. Ohio Jan. 5, 2016) (upholding privilege, but discussing Ohio's retreat since *Jackson*).

In addition to concluding that common law waiver and exceptions were not entirely eliminated by *Jackson*, the undersigned emphasizes that most of the current dispute involves document production. The Sixth Circuit has interpreted Ohio's privilege statute as applicable only to the attorney-client *testimonial* privilege, and not to privilege claims over documents. *See In re Professionals Direct Ins. Co.*, 578 F.3d 432, 440 (6th Cir. 2009) (finding no error in lower court's ruling that "by its terms §2317.02(A) applies to attorney testimony, not documents"); *see also Grace v. Mastruserio*, 182 Ohio App.3d 243, 249, 912 N.E.2d 608 (Ohio Ct. App. 2007) (limiting statute to cases in which a party is seeking to compel testimony of an attorney for trial or at a deposition – as opposed to cases where a party is seeking to compel production of nontestimonial documents."). The few cases cited by Fifth Third to the contrary are not persuasive, nor does the undersigned find that *Jackson* resolved the issue, as the issue was discussed only in a dissenting opinion. Instead, the undersigned finds persuasive *William Powell Co. v. Nat'l Indem. Co.*, Case No. 1:14-cv-807 (Doc. 119), 2017 U.S. Dist. LEXIS 55148, at *60 (S.D. Ohio Apr. 11, 2017), a bad faith case in which Magistrate Judge Litkovitz held that the "statute is limited to attorney testimony and does not extend to documents related to coverage issues that were created prior to the denial of coverage." *Id.*, Doc. 119 at 40. After extensive analysis of the case law, Judge Litkovitz concluded

that "the overwhelming weight of authority holds that the testimonial privilege….set forth in § 2317.02(A)(2) does not apply to documents."[13]  *Id.*, Doc. 119 at 42.

Having explained the limitations of *Jackson*, the undersigned turns next to the primary case relied upon by the Underwriters, *Sharp v. Trans Union L.L.C. See Sharp v. Trans Union L.L.C.,* 364 Ill. App. 3d 64 (Ill. App. 2006).  In *Sharp*, an Illinois court affirmed an order compelling disclosure of privileged documents reflecting the Assured's general counsel's knowledge in context of Errors and Omissions policy, where the policy language contained broad cooperation clause and identified "General Counsel" as a discovery agent, because the policy "was negotiated and written to require the disclosure of [the Assured]'s general counsel's knowledge, work product, and communications regarding the pre-policy litigation." *Id.* at 72.

Fifth Third urges this Court to reject *Sharp* in part because it was based on an earlier Illinois case, *Waste Management, Inc. v. Int'l Surplus Lines Ins. Co.*, 579 N.E.2d 322 (Ill. 1991), that Fifth Third proclaims to be "markedly different from, and inconsistent with, controlling Ohio law."  (Doc. 121 at 7).  It is true that Ohio has not adopted wholesale the *Waste Management, Inc.* approach, in which the Illinois court took an expansive view of a waiver of attorney-client privilege in a coverage dispute between an insurer and its insured.  While Ohio's approach may differ, however, the undersigned does not agree that *Sharp* is utterly without persuasive value.

Functionally speaking, Ohio's law is not as unique as Fifth Third proclaims.  The analysis of *Waite, Schneider, Bayless & Chesley LPA* is instructive.  In that case, the court explained that – regardless of whether it is termed an "exception" or a "waiver," the ultimate test in Ohio is fashioned from a "rule of necessity."  *Id.* at *5 (internal

---

[13]Magistrate Judge Litkovitz denied a request to certify the issue to the Ohio Supreme Court.  The undersigned recognizes that objections to Magistrate Judge Litkovitz's Order remain pending before the presiding district judge.

citation omitted); *see also id.*, at *7 (noting that Ohio's decision in *Squire Sanders* employed a rationale that was "functionally identical to that which Ohio's appellate courts used when applying the doctrine of implied waiver.")    In addition, Ohio law on attorney-client privilege does not differ in any significant respect from federal law. *See Lucas v. Gregg Appliances, Inc.*, 2014 WL 6901518, at note 1 (S.D.Ohio,2014) (quoting *MA Equip. Leasing I, L.L.C. v. Tilton,* 980 N.E.2d 1072, 1079–80 (Ohio App. 2012), for the proposition that "[t]here is no material difference between Ohio's attorney-client privilege and the federal attorney- client privilege.")

### C.  The "Rule of Necessity" Exception to Privilege in Ohio

Fundamentally, many of the disputed documents fall outside the scope of any privilege based upon the core subject matter of this litigation.    Fifth Third cannot withhold evidence that it has placed so squarely in issue.    Just as a client suing his former lawyer for legal malpractice or a prisoner-petitioner suing for a violation of his Sixth Amendment right to the effective assistance of counsel cannot claim privilege for all documents relating to his prior attorney/client relationship, so too is Fifth Third precluded from asserting its privilege for many of the withheld documents.

In addition to the various exceptions recognized in *Squire, Sanders*, the undersigned finds persuasive by analogy the exception to attorney-client privilege (and work product doctrine) recognized by Ohio in cases in which an insured brings a separate claim against its insurer for bad faith denial of coverage.[14]    *See Boone v. Vanliner Ins. Co.*, 744 N.E.2d 154, 157-158 (Ohio 2001) (holding materials are not worthy of protection); *see also Garg v. State Auto. Mut. Ins. Co.*, 800 N.E.2d 757, 762 (Ohio Ct. App. 2001). In discovery disputes related to such claims, "[t]he critical issue is

---

[14]As previously noted, Fifth Third has not filed a separate bad faith claim in this case, and of course, the instant discovery is not being sought by the insured against the insurer, but instead by the insurer against the insured.

whether the documents 'may cast light' on whether the insurer acted in bad faith." *William Powell Co.*, Doc. 119 at 36 (additional citations omitted). The *Boone* exception – akin to a "rule of necessity" exception in Ohio - has been applied post-*Jackson*. *Id.* (holding that exception continues was not abrogated by §2317.02(A)(2)).

As the plaintiff in Case No. 1:14-cv-869, Fifth Third has the burden to prove the essential elements of its claim, including Ross's fraudulent conduct, the causal link between Ross's conduct and Fifth Third's claimed loss, and that it "first discovered" the covered loss within the relevant period. Considering the critical issues at stake, the express language of the discovery condition and defined Discovery Agents, it would be contrary to the interests of justice to permit Fifth Third to assert privilege as broadly as it seeks to do here. *C.f., FDIC V. Fidelity and Deposit Co. of Maryland*, 2013 WL 2421770 (S.D. Ind. June 3, 2013) (finding waiver where bank had placed attorney's knowledge "at issue" rendering attempt to withhold all communications in time leading up to discover of loss to be improper), modified in part at 2013 WL 5938149 (S.D. Ind. Nov. 6, 2013).

Fifth Third cannot simultaneously rely on privileged information to prove its claims, while brandishing the "shield" of privilege to prevent the Underwriters from obtaining the same information. *See Squire, Sanders & Dempsey*, *L.L.P. v. Givaudon Flowers Corp.*, 127 Ohio St. 3d at 171 (recognizing "that the attorney-client privilege cannot at once be used as a shield and a sword."). By way of example, the Underwriters persuasively points to Fifth Third's redaction of five of six pages of a memo from Susan Clayton, an employee in the Bank Protection division of Fifth Third's Office of Risk Management, to Marc Brandt, an attorney in the Office of General Counsel, dated 12/22/2010 but memorializing a conference call held on March 30, 2010

"to discuss InsCap Management, LLC, its commercial lending relationship and allegations made against Fifth Third employee, Matt Ross." (Doc. 116, Exh. P). Both Clayton and Brandt worked in offices defined as "Discovery Agents," and other Discovery Agents attended the same meeting. Despite redacting as "privileged" most of the memo, Fifth Third has cited a principal's participation in the same March 30, 2010 call in responses to interrogatories seeking the factual basis for its claims. (Doc. 116, Exh. Q, responses 2 & 9).

Fifth Third argues strenuously that "[r]elevance alone is insufficient to overcome privilege." (Doc. 132 at 2). That is undoubtedly a correct statement of law, but it does not begin to describe the critical nature of information relating to Fifth Third's date of discovery of its loss, or the lack of any alternative source of that information to the Underwriters. Because information vital to the core issues of this case remains within the exclusive control and knowledge of Fifth Third, the requested documents simply are outside the scope of, and are excepted from, any privilege.

Fifth Third appears to agree – at least in some small respect – that it must provide the Underwriters with some of its investigatory materials. It maintains, however, that it has provided everything necessary relevant to the inquiry of "what did Fifth Third know and when did they know it" by providing the Underwriters with all of the underlying facts related to its discovery of its loss. In that respect, the parties' dispute arises from differing interpretations of the discovery condition.

Fifth Third maintains that the express language is restricted to the Discovery Agents' knowledge of wholly objective "facts." Thus, Fifth Third argues that the Discovery Agents (including but not limited to in-house counsel) may hold fast to their "mental impressions" under their asserted attorney-client privilege. By contrast, the

Underwriters assert that the discovery condition requires analysis of both the objective facts and the subjective knowledge possessed by the Discovery Agents, meaning that "mental impressions" and similar information that otherwise might be protected by privilege falls outside the scope of any privilege for purposes of this lawsuit.

Preliminary review of the bond language is necessary to resolve this dispute. In undertaking that review, the undersigned is guided by the principles set forth by the Sixth Circuit in *Construction Contractors Employer Group, LLC v. Federal Insurance Company*, 829 F.3d 449, 453 (6th Cir. 2016).

> Ohio state law dictates that interpretations of insurance contracts are questions of law for a court to answer. *Costanzo v. Nationwide Mut. Ins.*, 161 Ohio App.3d 759, 832 N.E.2d 71, 77 (2005). Ohio courts "examine the insurance contract as a whole and presume that the intent of the parties is reflected in the language used in the policy." *Westfield Ins. v. Galatis*, 100 Ohio St.3d 216, 797 N.E.2d 1256, 1261 (2003). The scope of insurance coverage is determined by construing the contract "in conformity with the intention of the parties as gathered from the ordinary and commonly understood meaning of the language employed." *Allstate Ins. v. Eyster*, 189 Ohio App.3d 640, 939 N.E.2d 1274, 1280 (2010) (quoting *King v. Nationwide Ins.*, 35 Ohio St.3d 208, 519 N.E.2d 1380, 1383 (1988)). When reviewing provisions regarding coverage exclusions, Ohio presumes that anything not clearly excluded from the policy is covered. *Home Indem. Co. of N.Y. v. Vill. of Plymouth*, 146 Ohio St. 96, 64 N.E.2d 248, 250 (1945). Therefore, "if a policy does not plainly exclude a claim from coverage, then an insured may infer that the claim will be covered." *Andersen v. Highland House Co.*, 93 Ohio St.3d 547, 757 N.E.2d 329, 332 (2001).

*Id.*

The first clause of the discovery condition defines a key date in terms of when Discovery Agents became aware of "facts which a reasonable person would expect to result in a loss of a type covered by this bond." In general, cases reviewing similar provisions have held that "[m]ere suspicion of loss is not sufficient to demonstrate that an insured discovered the loss." *Construction Contractors Employer Group, LLC v. Federal Insurance Co.*, 829 F.3d at 454 (*citing FDIC v. Aetna Cas. & Sur. Co.*, 903 F.2d

1073, 1079 (6th Cir. 1990)). Instead, the "reasonable person" standard anticipates that the date of discovery occurs when "the insured discovers facts showing that dishonest acts occurred *and appreciates the significance of those facts.*" *FDIC v. Aetna & Sur. Co.*, 903 F.2d at 1079 (internal citations omitted, emphasis added). The emphasis on "appreciate[ing] the significance" of facts strongly suggests that the standard embodies some degree of subjective analysis, including (according to the Underwriters) the legal analysis and mental impressions of a "reasonable person" who may be an attorney. *See, e.g. Construction Contractors Employer Group, LLC*, 829 F.3d at 453-54 (citing *Resolution Trust Corp. v. Fidelity & Deposit Co.*, 205 F.3d 615, 631 (3rd Cir. 2000) for principle that trier of fact may analyze "the full range of information the insured knew…based on all the circumstances").

In addition to concluding that the first clause contains a subjective component, the undersigned finds that the discovery condition as a whole clearly entitles the Underwriters to much of the discovery they seek. In part, that is because the second clause defines the critical date in terms of when Discovery Agents became "aware of…an actual or potential claim in which it is alleged that the Assured is liable to a third party." Read as commonly understood and in the context of the totality of the fidelity bond, this language pins the date of discovery to when any Discovery Agent subjectively believed that an "actual or potential claim" under the bond had arisen. For Discovery Agents who are not attorneys, their "awareness" of any "actual or potential claim" against Fifth Third would include becoming "aware of" a claim from Fifth Third's counsel. In other words, unlike most cases, the bond's terms require, or make necessary to Fifth Third's cause of action (as well as the Underwriter's affirmative defenses), the mental impressions of the Discovery Agents, which necessarily excludes

from protection the type of information that might otherwise fall within the asserted privileges.[15]

Fifth Third argues valiantly for a different interpretation of the clause that pinpoints discovery as when a Discovery Agent becomes aware of "an actual or potential claim in which it is <u>alleged</u> that the Assured is liable to a third party."  By zeroing in on the word "alleged," Fifth Third advocates for an <u>objective</u> interpretation, in which subjective beliefs or conclusions are irrelevant, so long as the Discovery Agents were not aware of any actual third party "allegations" of a claim.  In this fashion, Fifth Third would limit the scope of discovery to when its Discovery Agents became aware of either objective "facts" or third party "allegations" about a claim. (Doc. 132 at 6).  In Fifth Third's view, any legal conclusions or mental impressions of its Discovery Agents are irrelevant.  Thus, it would not matter if Fifth Third's counsel subjectively believed that Fifth Third could be liable to a third party based on Ross's misconduct, so long as a hypothetical "reasonable person" would not have drawn that conclusion, and so long as no formal "allegations" had been made regarding a covered loss.

In the context of this discovery dispute, the undersigned finds Fifth Third's interpretation to be overly strained and unduly limited in a manner not supported by the language of the contract as a whole.

Fifth Third protests that this Court should not accept the Underwriters' interpretation, because if fidelity bonds were so construed, "the cases would be legion to support their contention that the attorney-client privilege is waived in every single

---

[15]For example, the Underwriters point to a document from Fifth Third's outside counsel, Michael Gill, to enumerated Discovery Agents dated May 13, 2010, referring to information that on May 11, 2010, "Columbus Nova's lawyers suggested that not only do they intend to defend the claim on the guarantees based on valuation fraud, but that they are exploring the possibility of bringing a separate claim against Fifth Third, among others, for damages Columbus Nova has sustained."  (See Doc. 127 at Exh. U). The last page of the document - which appears to discuss Matt Ross and Columbia Nova's potential claims – is largely redacted.

case where an insured seeks coverage under a fidelity bond." (Doc. 132 at 7). However, the lack of case law on this precise issue signifies little. Fidelity bonds are negotiated with language specific to each contract. The cases cited by Fifth Third contain variations in language, such as not including the "Office of General Counsel" in the defined Discovery Agents, and/or including only the "reasonable person" standard tied to "facts" without the addition of alternative "potential claim" language.

Additionally, one of the seminal cases upon which Fifth Third relies to support its contention that the language is restricted to the Discovery Agents' knowledge of objective "facts" supports the Underwriters' interpretation. Fifth Third cites *Resolution Trust Corp. v. Fidelity and Deposit Co. of Maryland*, 205 F.3d 615, for the proposition that an attorney's testimony was limited to facts "detail[ing] the various pieces of information [insured's] legal department discovered during the bond period." (Doc. 132 at 8). But the Third Circuit explicitly held that the "reasonable person" standard at issue in that case was "comprised of a subjective and objective component." *Resolution Trust*, 205 F.3d at 630. Moreover, the summary of the attorney's testimony in the case makes clear that counsel's testimony was not limited to "facts," but instead detailed her mental impressions, and subjective beliefs and conclusions about those facts, including her analysis of the bank's exposure. *See generally id.*, at 627-630.

Thus, what the Discovery Agents knew about the loss for which Fifth Third seeks recovery under the fidelity bonds, prior to the expiration of the coverage period, includes both their subjective opinions and objective facts, even if their subjective understanding was informed by information that in another context, could fall within a privilege. At the same time, any similar information first discovered about Ross at a later time, <u>after</u> the end of the bond period, is not relevant to the issue of whether Fifth Third "first

discovered" Ross's misconduct during or prior to the inception of the bond period. *Accord Fidelity Nat'l Financial, Inc. v. Nat'l Fire Ins. Co.*, 2014 WL 4909103 at *22 (S.D. Ca. Sept. 30, 2014) (noting that later acquired knowledge is not relevant to discovery condition).

### D.  The Cooperation Clause

As additional support for compelling the information it seeks, the Underwriters rely upon the bonds' cooperation clause, in which Fifth Third agreed to turn over "all pertinent records" relevant to the knowledge of its defined discovery agents.  Section 7(d) of the Primary Policy provides:  "Upon the Underwriter's request and at reasonable times and places designated by the Underwriter the Insured shall…(2) produce for the Underwriter's examination all pertinent records; and (3) cooperate with the Underwriter in all matters pertaining to the loss."   Under this clause, the Underwriters assert that all documents that bear on the issue of Fifth Third's "discovery" of Ross's alleged misconduct and/or discovery of InsCap's liability claim are required to be produced. *Accord Sharp*, 364 Ill. App. 3d at 72.

Fifth Third objects to reliance on the cooperation clause, arguing that such consideration may be consistent with *Waste Management*, but runs afoul of Ohio's more guarded view toward expanding exception or waiver to the time-honored privilege. Although Ohio tends to read cooperation clauses more narrowly, the fidelity bond contracts also must be read as a whole.  Therefore, the cooperation clause must be read in light of the "discovery" condition that requires Fifth Third to affirmatively prove that its Discovery Agents  – including but not limited to attorneys in the Office of General Counsel - "first discovered" the insured loss at a time that would fall within the coverage period.  To the extent that the undersigned concludes that Ohio would take a practical

"rule of necessity" approach to Fifth Third's broad assertion of privilege, the cooperation clause at issue provides modest additional support for the exception determined to apply to the facts of this case. Fifth Third alone is in possession of key information critical to resolution of core issues, and must share its evidence on the issue of the date of discovery with its insurer.

### E.   The Bank Examination Privilege and SARs Information

The Underwriters also seek documents that Fifth Third has declined to disclose under a "bank examination privilege,"  including documents concerning Fifth Third's internal investigation into the allegedly fraudulent conduct, and internal documents concerning Fifth Third's deliberations related to its reports to regulators about Ross's misconduct.

The bank examination privilege belongs to the Federal Reserve. *See In re Bankers Trust Co.*, 61 F.3d 465, 472 (6th Cir. 1995). Regulations require any party seeking information protected by the privilege to "file a written request with the General Counsel of the Board...." 12 C.F.R. § 261.22(b)(1).

Fifth Third urges this Court to deny Underwriters' motion in part because they have not stated that they have exhausted their administrative remedies through such a request, though the Underwriters counter that it is Fifth Third that should make the request.  Additionally, and in the alternative, Fifth Third argues that even if Underwriters had exhausted its administrative remedies, courts balance the competing interests of the parties when considering whether to compel evidence subject to the bank examination privilege, including the relevance of the evidence, the availability of other evidence, the seriousness of the litigation and issues involved, the role of the government in the litigation, and the possibility of future timidity by government

employees who will be forced to recognize that their secrets are violable. *In re Bankers Trust Co.*, 61 F.3d at 471-472. Both parties agree that the bank privilege is not absolute but instead is a qualified privilege.

Fifth Third argues that none of the documents withheld under the "bank examination privilege" pertain to any actual or alleged misconduct by Ross, implying - without admitting that regulatory documents pertaining to Ross may have been withheld under a different privilege (the "SARs privilege") discussed below. Thus, Fifth Third contends that the Underwriters are not able to make the type of strong showing or relevance required to overcome the bank examination privilege Fifth Third retains for communications with its regulators. In addition, the Bank asserts that any relevant information contained in documents withheld under the bank examination privilege has been produced through other documents.

The Underwriters argue that "scores of documents" have been withheld under the "bank examination privilege" even though they do not appear to be communications to or from any bank regulator. (Doc. 127 at 20). However, the Underwriters also state they are not seeking documents that are plausibly subject to the bank examination privilege, but instead, are focusing their efforts on documents showing Fifth Third's "internal deliberations about, and awareness of, Ross's conduct," (Doc. 127 at 20), which Fifth Third indicates have <u>not</u> been withheld on grounds of bank examination privilege.

Unfortunately, neither party has provided sufficient information to this Court, or - it appears - to each other - regarding the precise documents that the Underwriters seek. Therefore, the Court invites the Underwriters to more clearly identify to Fifth Third each and every one of the "scores" of documents as to which it seeks disclosure. Fifth Third

shall then respond or alternatively, provide further information (particularly if the document is not to or from a bank regulator) as to why the privilege holds.

The undersigned agrees that the most relevant information is that pertaining to Ross. However, the Underwriters are not entitled to any information relating to Suspicious Activity Reports ("SARs") that Fifth Third may have filed concerning Ross, because Fifth Third is prohibited from disclosing that type of information under the Annuzio-Wylie Anti-Money Laundering Act (the "Act"). Under the Act and corresponding regulations, banks "are prohibited from disclosing either that [a] SAR has been filed or the information contained therein." *Lee v. Bankers Trust Co.*, 166 F.3d 540, 544 (2nd Cir. 1999).

There is no exception for disclosure of an SAR "in the context of discovery in a civil lawsuit." *Cotton v. PrivateBank & Trust Co.*, 235 F. Supp.2d 809, 814 (N.D. Ill 2002). Therefore, it is proper for Fifth Third to continue to decline to disclose whether or not it ever prepared or filed an SAR relating to any issue in this lawsuit. At the same time, however, Fifth Third may not refuse to disclose any documentation relating to Ross, merely because it may overlap information used in furtherance of an SAR. In *Cotton* and other cases, courts have held that the absolute privilege "applies only to the SARs themselves and the information contained therein, but not to their supporting documentation." *Gregory v. Bank One, Indiana, N.A.*, 200 F. Supp.2d 1000, 1002 (S.D. Ind. 2002); *see also Well v. Long Island Sav. Bank*, 195 F. Supp.2d 383, 389 (E.D. N.Y. 2001). Therefore, while Fifth Third may legitimately object to production of any SARs or information that was prepared solely under the Act, it cannot withhold "all of its internal deliberations about Ross's alleged misconduct" - if independently created as part of Bank's investigation - merely by asserting that it duplicates factual information that may

have been used in an SAR. *See generally Bank of China v. St. Paul Mercury Insur. Co.*, 2004 WL 2624673 (S.D.N.Y. 2004).

Citing *Gregory*, 200 F. Supp.2d at 1003, the Underwriters contend that Fifth Third should be forced to forfeit its bond claims if the claims are predicated on privileged SAR information. The Underwriters' argument goes too far. There is no indication that Fifth Third's claims rest on an SAR that Fifth Third has justifiably refused to provide.

### F. Prior Disclosures and Common Interest

The Underwriters also argue that Fifth Third has waived any privilege claims as to communications "on the same subject matter" in light of prior selective disclosures made by Fifth Third in response to other requests. The Underwriters point to Fifth Third's limited disclosures of documents relating to internal decision-making about the Ultra loan program, and its pre-bond and post-bond investigations of Ross, suggesting that such disclosures create a broad waiver for nearly all documents the Underwriters now seek pertaining to the same subjects. (Doc. 116 at 27).

The undersigned rejects the Underwriters' argument that Fifth Third has completely waived all privileges through its limited disclosures to date. Fifth Third maintains that it has disclosed only factual information. (See Doc. 121 at 10-12). Fifth Third's assertion is borne out in part by the current dispute, as well as the related dispute concerning the scope of the recent 502(d) Stipulated Order. The Underwriters' argument that Fifth Third has essentially waived any privilege for virtually all documents that form the subject matter of the pending motions is overbroad and unconvincing.

Likewise, the undersigned rejects the Underwriters' argument that Fifth Third's prior position that it shared a "common interest" with RLI in the Illinois case should be used to enforce a broad waiver of any privilege here. To defend against an argument

24

that Fifth Third had waived any privilege by providing documents to its insurer, Fifth Third argued there that "RLI's fidelity insurance policies obligate Fifth Third to cooperate with RLI and to provide RLI with all requested information and documents." (Doc 127 at 15, citing Exhibit V). Fifth Third specifically claimed that it had a "common interest" with its insurers concerning the basis for its claim, in part based upon the "express cooperation clauses" in RLI's bonds that required Fifth Third to "cooperate…in all matters pertaining to the loss." *Id.* Although the undersigned determined above that the cooperation clause lends modest additional support to the exception to privilege found in this case, the undersigned is less persuaded by the Underwriters' attempt to use Fifth Third's defensive argument in state court offensively in this Court as some type of waiver. This Court will not hold Fifth Third to the same position given the differing postures of the parties in the underlying Illinois case as well as the nuanced differences in the approaches taken by the Illinois and Ohio courts.

### G. The Relationship of Work Product to This Litigation

One of the categories of documents that the Underwriters seek to compel relates to Fifth Third's assertion of work product for materials created as long ago as 2007, given that Fifth Third did not even begin litigation against InsCap until June 2010. The Underwriters concede that they do not seek communications after the initiation of this lawsuit in November 2014,[16] but they appear to seek most other materials claimed as work product.

The Court will deny the Underwriters' request for documents as to which work product has been asserted "created long before litigation between InsCap and Fifth

---

[16]The Underwriters' definition of "work product" is too narrow, insofar as the Underwriters tie the privilege to the date this litigation was filed. Fifth Third may claim a legitimate work product privilege for materials prepared "in anticipation of litigation" for some reasonable period of time prior to date that this federal litigation was filed.

Third." (Doc. 116 at 21). Fifth Third explains it has asserted "work product" for 2007 and 2008 records that were created in anticipation of litigation with unrelated borrowers.

Federal law governs the work product doctrine. *See In re Prof'ls Direct Ins. Co.,* 578 F.3d 432, 438 (6th Cir.2009). Sixth Circuit case law supports the view that the privilege shields all "work product" produced in anticipation of any litigation, including litigation that is wholly unrelated to this action or the prior InsCap litigation. *See U.S. v Leggett & Platt*, 542 F.2d 655, 660 (6th Cir. 1975); *see also generally, F.T.C. v. Grolier Inc.*, 462 U.S. 19, 25 (1983) (noting that the literal language of Rule 26 protects materials prepared for any litigation or trial as long as they were prepared by or for a party to the subsequent litigation.").

Fifth Third argues that the 2010 documents that it withheld relate to Fifth Third's potential claims against Concord and the LIPF II facility, as opposed to Concord's claims against Fifth Third. It states that a single 2009 document was withheld on the basis of attorney-client privilege, with "work product" inadvertently included as a secondary basis for withholding.

The work product privilege is a qualified one that will give way if the requesting party has a substantial need for the materials and an inability to obtain the information by other means. *See generally In re Pergo Co.,* 128 F.3d 430, 437 (6th Cir. 1997). However, the undersigned will not compel the referenced 2007-2010 work product, because the doctrine is not restricted to work product prepared in anticipation of this federal litigation, and because the Underwriters have not made a strong showing of relevance or substantial need.

### H. Alleged Deficiencies of Fifth Third's Privilege Log

#### 1. Unlogged Documents

26

The Underwriters ask this Court to compel Fifth Third to disclose more than 5,000 documents that the Underwriters claim that Fifth Third has withheld from production, or produced only redacted copies, but has not properly included on its privilege log. Apparently, these communications include all of Fifth Third's communications with outside counsel or its investigator, James Rechel, prior to commencement of this lawsuit.

In response, Fifth Third argues that the burden of showing what is missing from the log should be on the Underwriters. I agree. The Underwriters assert that it made an attempt to identify specific documents *after* it filed its motion to compel, on April 14, 2017, when it sent to Fifth Third two Excel spreadsheets listing a total of 6,357 documents that the Underwriters believe were not properly logged. However, the Underwriters concede that one of the two spreadsheets (referring to 165 pages) could not be read. In its reply memorandum, Fifth Third explains that it was not provided sufficient opportunity to review the second spreadsheet, which initially also appeared to be unreadable but in fact contained 6,192 numbers identifying specifically disputed documents.

The Underwriters' efforts concerning the alleged inadequacies of Fifth Third's privilege log reflect less than a good faith effort to resolve the dispute to date. Fifth Third maintains that many of the documents on the spreadsheet that it was able to review actually were logged, produced or not redacted for privilege.[17] For example, Fifth Third states that of the documents that it has been able to examine, 259 of the first

---

[17]In a related discovery conference held on Monday, April 24, RLI submitted a copy of a privilege log that was not helpful to the Court, insofar as it failed to accurately represent the more limited list of redacted documents referenced in Fifth Third's current privilege log. At this point, the Court will assume that RLI's use of an outdated exhibit was not intentionally misleading, but cautions counsel that any similar future errors are likely to draw stronger criticism.

286 documents identified on the readable spreadsheet were in fact listed on Fifth Third's revised privilege log provided in January 2017. (Doc. 132 at 11, n.13).

The Court will require the Underwriters to identify more specifically in what way each of the 6,357 documents were improperly logged. The Underwriters should identify each document that they believe to have been excluded from Fifth Third's most recent log, or alternatively, what deficiency the Underwriters believe exists as to each document for which additional production is sought. At the same time, Fifth Third's alleged redactions "for non-responsive content" as to which there is no claim of privilege are not proper and should immediately be produced. (*See* Doc. 132 at n. 13); *see generally Pavillion Bank v. OneBeacon American Ins. Co.*, 2013 WL 12126258 at *3 (N.D. Tx Nov. 13, 2013) (collecting cases).

## 2. Incomplete Descriptions

The Underwriters also argues that the privilege log is incomplete to demonstrate privilege as to various documents that lack a sufficiently specific description of their subject matter, or are to or from "unidentified" persons. However, Fifth Third notes that several examples identified by the Underwriters do in fact contain descriptors identifying the author as counsel, or refer to documents that have been subsequently produced.

This Court declines to grant the Underwriters' motion to compel large categories of documents on the basis of a general complaint that the descriptors provided on Fifth Third's log are insufficiently specific. As with the claim that Fifth Third has failed to adequately log 6,357 documents, the Underwriters must provide a list to Fifth Third of logged documents that the Underwriters believe contain insufficiently specific descriptions of the basis for the asserted privilege. If additional discussion between counsel concerning specifically identified documents does not yield further information,

the Court will consider an additional telephonic conference to painstakingly go through each challenged document, after the Underwriters identify to this Court (and Fifth Third confirms it will not provide further information) the precise alleged deficiency. In determining the specificity required, the undersigned directs both parties to the analysis set forth in *William Powell Co.*, *supra.*

### III. Fifth Third's Motion for a Protective Order

The Underwriters plan to depose three attorneys who previously worked in Fifth Third's Office of General Counsel, and who investigated Matt Ross and handled Concord's claims relating to the LIPF II Program. Paul Reynolds and James Hubbard also were Executive Officers of Fifth Third. Both Executive Officers and the Office of General Counsel are identified Discovery Agents. Fifth Third concedes that all three attorneys played "various roles in the investigation of Ross's misconduct and litigation that was eventually brought by Concord against Fifth Third in connection with the LIPF II Program." (Doc. 122 at 2). However, while Fifth Third concedes that the attorneys may be deposed to discover the "facts they knew about Ross's dishonesty and when they knew them," (Doc. 121 at 20), Fifth Third maintains that the lawyers' "mental impressions, legal strategy, and legal advice" remain subject to attorney client privilege and the work product doctrine. For the same reasons that the documentary evidence relating to this subject matter is directly at issue and an exception from attorney-client privilege, so too is the testimony of these three attorney-witnesses excepted from privilege, consistent with the remainder of this opinion.

In addition, the undersigned concludes that although R.C. §2317.02.(A)(1) limits testimony about "communications" with a client (other Fifth Third employees), it would not limit questions concerning the three attorneys' own subjective mental impressions

and evaluations of whether a covered "claim or potential claim" against Fifth Third existed, or when they became aware of facts that would have led a reasonable person to conclude that Fifth Third had experienced a covered loss under the bonds.

Last but not least, the Ohio privilege statute provides a potentially relevant exception that may permit even otherwise privileged testimony. Namely, "if the client voluntarily testifies…the attorney may be compelled to testify on the same subject." Fifth Third bears the burden of proof that its claim is not excluded under the discovery condition through the objective or subjective knowledge of its Discovery Agents. Thus, the Court can assume that Fifth Third already has provided testimony (and/or soon will, in the context of its Rule 30(b)(6) deposition and this Order) about when its Discovery Agents became aware of the claim, so as to trigger coverage under the bonds. To that extent, the Ohio statute expressly permits counsel (who also are Discovery Agents) to be compelled to give testimony.

## IV.     Conclusion and Order

For the reasons explained above, Fifth Third should re-examine the documents it has withheld in light of the determination that much of the withheld discovery is excepted from any privilege under Ohio law and the facts of this case. However, the undersigned declines to compel the wholesale production of the many broad categories identified by the Underwriters.

Many of the categories are over-inclusive. For example, the Underwriters seek "any" documents sent to or from Ross, and "all" documents sent to/from all Discovery Agents, but that would likely include some documents unrelated to any claim or defense in this litigation. Some of the categories would encompass materials as to which Fifth Third maintains an absolute privilege (re SARs) and the Underwriters have not

demonstrated with sufficient specificity its need for any particular documents subject to the bank examination privilege. The undersigned also declines to compel at this time documents withheld as work product created prior to any litigation between InsCap and Fifth Third; or the production of documents that the Underwriters believe were improperly logged, and/or for which the Underwriters seek additional information to verify the existence of privilege.

For the reasons stated, IT IS ORDERED THAT:

1. Underwriters' motion to compel production of documents improperly withheld or redacted (Doc. 116) is GRANTED in part consistent with this Memorandum Opinion and Order;

2. Fifth Third's motion for a protective order (Doc. 122) is DENIED.


 *s/ Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge